## IN THE CIRCUIT COURT OF THE CITY OF ST. LOUIS
## STATE OF MISSOURI

| | |
|---|---|
| **MONOLITO STARK**<br>3421 Ranch Lane<br>Saint Louis, Missouri 63121 | )<br>)<br>)<br>) |
| *Plaintiff,* | )<br>) |
| **VS.** | )<br>) |
| **SA HOSPITAL ACQUISITION GROUP,<br>LLC, D/B/A SOUTH CITY HOSPITAL<br>F/K/A ST. ALEXIUS HOSPITAL,** | )<br>)<br>)<br>) |
| <u>Serve:</u> Missouri Secretary of State<br>600 West Main Street<br>Jefferson City, MO  65101 | )<br>) |
| *Defendant.* | |

**Case No.**

**Jury Trial Demanded**

### <u>CLASS ACTION PETITION</u>

The Plaintiff, MONOLITO STARK (hereinafter "Stark" or "Plaintiff") on behalf of

himself, and the proposed class, defined below, alleges and states as follows:

### NATURE OF THE ACTION

1.     This action arises from the failure of a healthcare provider, Defendant, SA Hospital

Acquisition Group, LLC, d/b/a South City Hospital, formerly known as St. Alexius Hospital

(hereinafter, "South City Hospital"), to protect its patients' Personally Identifying Information[1]

and Protected Health Information[2] (collectively "PHI").

---

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

[2] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is

- 1 -

2.     That, upon information and belief, on or about November 13, 2021 or November 14, 2021, unknown third parties were able to access one of South City Hospital's "practice location" facilities and take a back-up imaging server containing current and former patients' PHI, including their names, Social Security numbers, health insurance information, radiology imaging, and/or other related medical information[3] (hereinafter the "Data Breach").

3.     That Plaintiff is a former patient of South City Hospital, and as a result of Defendant's inadequate security practices as described hereinafter, Stark's PHI was compromised in the Data Breach, resulting in injury and damages.

4.     Accordingly, Plaintiff, on his own behalf and on behalf of a class of similarly situated individuals, brings this action seeking injunctive relief, damages, and restitution, together with costs and reasonable attorneys' fees, the calculation of which will be based on information in Defendant's possession.

**THE PARTIES**

5.     Plaintiff Stark is a natural person and citizen of the State of Missouri, residing at

---

created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information*. A "covered entity" is further defined as including, "[a] health care provider who transmits any health information in electronic form in connection with a transaction covered by this subchapter." *See Id.* "Business Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last accessed Apr. 16, 2020).
South City Hospital is clearly a "covered entity" and some of the data compromised in the Data Breach that this action arises out of is "protected health information", subject to HIPAA.
[3] *See* "South City Hospital Provides Notice of Data Privacy Incident," undated, available at https://www.southcityhospitalstl.com/wp-content/uploads/2022/01/South-City-Hospital-Provides-Notice-of-Data-Privacy-Incident2.pdf

3421 Ranch Lane, Saint Louis, Missouri 63121 in St. Louis County, Missouri.

6.      That Defendant, South City Hospital, formerly known as St. Alexius Hospital, is a limited liability company organized and existing under the laws of the State of Delaware, with a principal place of business at 16192 Coastal Highway, Lewes, Delaware 19958.

7.      That South City Hospital operates in the City of St. Louis, at 3933 South Broadway, St. Louis, Missouri 63118.

## JURISDICTION AND VENUE

8.      That this court is vested with subject-matter jurisdiction pursuant to Mo. Stat. § 478.070.

9.      That this Court has personal jurisdiction over South City Hospital pursuant to Mo. Stat. § 506.500, as Defendant transacts business in this state, has engaged in the commission of tortious acts within Missouri, and/or owns real estate in this state.

10.     That venue is proper in this Court pursuant to Mo. Stat. § 508.010 as Plaintiff was suffered the injury-in-fact complained of herein in the City of St. Louis where, upon information and belief, South City Hospital's hospital, infrastructure, and personnel are located, administered, managed, and programmed, and where the damages to Stark were caused.

## COMMON FACTUAL ALLEGATIONS

11.     That Defendant South City Hospital operates medical facilities in St. Louis, Missouri, including a for-profit, one hundred and seventy-eight (178) bed hospital at 3933 South Broadway, St. Louis, Missouri 63118, providing medical care to customers including but not limited to "acute care, intensive care, surgical services, interventional cardiac catheterization lab procedures, and behavioral health treatment to patients."[4]

---

[4] South City Hospital -website, "About Us," https://www.southcityhospitalstl.com/about-us/

- 3 -

12.     That as a condition of providing healthcare services to patients, South City Hospital requires patients to entrust it with their PHI.

13.     That, as stated in its current "Patient and Family Handbook," "[i]nformation security is among South City Hospital's highest priorities, and we have strict security measures in place to protect information in our care."[5]

14.     In fact, patient entrustment of their PHI to South City Hospital was integral and material to Defendant rendering those patients medical care and treatment. As stated in Defendant's "Patient and Family Handbook":

> When you're admitted to the hospital, we give you a safety band with your name, date of birth, and medical record number. This safety band must be worn at all times during your hospitalization. Staff members will always check your safety band before giving you any medicine or performing any test or procedure. In some cases, they may ask for your name and date of birth. Please be patient when your identity is verified often— it's for your own safety. We use bar code technology to help make sure medicine is matched to the patient.
> For surgical procedures, you should always confirm which procedure you are to undergo and where on the body it will take place. The area of your procedure should always be marked prior to surgery, when possible. Our team will also call "time-outs" to ensure your safety.[6]

15.     That, as follows below, Plaintiff Stark and the proposed Class members entrusted their PHI to Defendant for the purpose of receiving medical care and treatment.

16.     That South City Hospital represented to Plaintiff and the proposed Class members that it would take adequate measures to safeguard the PHI entrusted to them.

17.     That South City Hospital maintains and stores its patients' PHI, including on the "back-up imaging server" that was accessed in the Data Breach.

---

[5] "South City Hospital Provides Notice of Data Privacy Incident," undated, available at https://www.southcityhospitalstl.com/wp-content/uploads/2022/01/South-City-Hospital-Provides-Notice-of-Data-Privacy-Incident2.pdf, pg. 4 (unpaginated)
[6] *See* South City Hospital Patient and Family Handbook, pg. 7, available at

- 4 -

18.    That on or about November 13, 2021 or November 14, 2021, unknown third parties were able to access one of South City Hospital's "practice location" facilities and steal a "back-up imaging server" containing approximately 21,601[7] of its current and former patients' PHI, including their names, Social Security numbers, health insurance information, radiology imaging, and/or other related medical information.

19.    That, according to South City Hospital, the foregoing Data Breach was discovered on or about November 15, 2021, and Defendant "launched an investigation into the scope of the event and notified law enforcement" and "determined that a back-up imaging server containing sensitive information for certain patients was taken from one of its practice locations in connection with the burglary."[8]

20.    That although South City Hospital became aware of the foregoing Data Breach on November 15, 2021, it was not until January 2022 that Defendant began to notify its patients whose PHI had been affected of the Data Breach, in a letter the "South City Hospital Provides Notice of Data Privacy Incident," ("Notice") attached as Exhibit 1.

21.    Further, Defendant did not report the Data Breach to the U.S. Department for Health and Human Services, Office for Civil Rights until January 14, 2022.[9]

22.    That in South City Hospital's Notice, it encouraged its patients whose PHI had been affected to call a dedicated toll-free line to answer patient questions and encouraged them to remain vigilant against incidents of identity theft and fraud; review their account statements; and to

---

[7] *See* U.S. Department of Health and Human Services, Office for Civil Rights, Breach Portal: Notice to the Secretary of HHS Breach of Unsecured Protected Health Information, available at https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf

[8] "South City Hospital Provides Notice of Data Privacy Incident," undated, available at https://www.southcityhospitalstl.com/wp-content/uploads/2022/01/South-City-Hospital-Provides-Notice-of-Data-Privacy-Incident2.pdf

[9] https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf

monitor your credit reports for suspicious activity.

23.     In addition, the Notice informed affected patients of the right to place a "security freeze" on their credit report, or a fraud alert.

24.     Plaintiff and members of the Proposed Class are victims of the Data Breach who relied on South City Hospital to keep their PHI confidential and securely maintained.

25.     South City Hospital was negligent in failing to adequately secure the PHI of its current and former patients, Plaintiff Stark and the proposed Class members, which Defendant stored and maintained in its computer systems.

26.     That South City Hospital has admitted that its security measures for protecting the PHI taken in the Data Breach were inadequate, since following the Data Breach it implemented additional measures and reviewed existing security policies to further protect against incidents similar to the Data Breach.[10]

27.     South City Hospital knew or should have known of the likely risk of the Plaintiff and Class members' PHI being accessed by unauthorized parties unless Defendant undertook adequate security measures; the "burglary" by unauthorized parties resulting in the taking of the back-up imaging server containing PHI is just another data breach event which could have been prevented had appropriate measures been taken.

28.     Over the past several years, data breaches have become alarmingly commonplace. In 2016, the number of data breaches in the U.S. exceeded 1,000, a 40% increase from 2015. The next year, that number increased by nearly 50%. The following year the healthcare sector was the

---

[10] "South City Hospital Provides Notice of Data Privacy Incident," undated, available at https://www.southcityhospitalstl.com/wp-content/uploads/2022/01/South-City-Hospital-Provides-Notice-of-Data-Privacy-Incident2.pdf, pg. 4 (unpaginated) (last accessed April 27, 2022)

second easiest "mark" among all major sectors and categorically had the most widespread exposure per data breach.

29.     Hospital data breaches have continued to rapidly increase. According to the 2019 Healthcare Information and Management Systems Society Cybersecurity Survey, 82 percent of participating hospitals reported having a significant security incident within the last 12 months, with a majority of those being caused by "bad actors."

30.     The healthcare industry has "emerged as a primary target because [it sits] on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."

31.     The PHI stolen in the Data Breach is significantly more valuable than the loss of, say, credit card information in a large retailer data breach. Victims affected by those retailer breaches could avoid much of the potential future harm by simply cancelling credit or debit cards and obtaining replacements. The information stolen in the Data Breach—most notably name, date of birth and social security number—is difficult, if not impossible, to change.

32.     PHI data for sale is so valuable because PHI is so broad, and it can therefore be used for various criminal activities, such as creating fake IDs, buying medical equipment and drugs that can be resold on the street, or combining patient numbers with false provider numbers to file fake claims with insurers.

33.     As storehouses of that lucrative information, healthcare providers like South City Hospital are also highly targeted by cybercriminals because they lack "sufficient resources to prevent or quickly detect a data breach," making them an easier target.

34.     South City Hospital failed to adequately train its employees on even the most basic

of security and/or cybersecurity protocols, including:

      a.     How to secure and protect computer systems containing patient PHI;

      b.     Locking, encrypting, and limiting access to computers and files containing sensitive information; and,

      c.     Implementing guidelines for maintaining and communicating sensitive data.

35.     The Data Breach was caused by South City Hospital's violation of its obligation to abide by best practices and industry standards concerning the security of its computer systems and facility security. South City Hospital failed to comply with security standards and allowed its victims' PHI to be stolen by failing to implement security measures that could have prevented or mitigated the Data Breach.

### The Data Breach and Notice Letter

36.     That South City Hospital admitted to the Data Breach in its January 2022 Notice letter.

37.     The Notice letter recommended that patients to remain vigilant against incidents of identity theft and fraud, to review their account statements, and to monitor their credit reports for suspicious activity.

38.     South City Hospital identified only the following actions it undertook to mitigate and remediate the harm caused by its data breach:

> Upon becoming aware of this incident, we immediately took steps to investigate, and notified law enforcement. We implemented additional measures and are reviewing existing security policies to further protect against similar incidents moving forward.[11]

---

[11] *Id.*

- 8 -

4891-7638-8640, v. 2

South City Hospital did not specify what additional measures were implemented to increase security and protect Plaintiff's personal information.

***PHI was Stolen and Defendant Immediately Recognized the Risk of Identity Theft***

39.     At the heart of this action is South City Hospital's failure to adequate protect Plaintiff's and the Class Members' PHI from unauthorized disclosure to and access by third-parties, whether knowingly and willfully or negligently, as required by law, and that Plaintiff and the Class Members have suffered legally cognizable, concrete, and tangible injury as a direct result, including fraudulent bank charges.

40.     There is a high and substantial likelihood that Plaintiff's and the Class Members' stolen PHI is being misused by cyber-criminals right now, and that misuse will be ongoing and without authorization. Plaintiff and Class Members therefore have incurred significant out-of-pocket costs, including those associated with the prevention, detection, recovery and remediation from identity theft or fraud.

41.     South City Hospital recognized the actual imminent harm and injury that flowed from the Data Breach, as in its Notice it encouraged affected patients to remain vigilant against incidents of identity theft and fraud, to review their account statements, and to monitor their credit reports for "suspicious activity."[12]

42.     That while companies that have had similar data breaches routinely offer two (2) years of credit monitoring, South City Hospital has offered none.

43.     The act of stealing or improperly accessing Plaintiff's and the Class Members' PHI,

---

[12] "South City Hospital Provides Notice of Data Privacy Incident," undated, available at https://www.southcityhospitalstl.com/wp-content/uploads/2022/01/South-City-Hospital-Provides-Notice-of-Data-Privacy-Incident2.pdf, pg. 5 (unpaginated) (last accessed April 27, 2022)

- 9 -

and the cyber-criminals' purpose in stealing Plaintiff's and the Class Members' PHI, was to commit additional illegal acts and crimes, such as generating fraudulent charges with Plaintiff's and the Class Members' financial accounts, gaining unauthorized access to their internet accounts, opening unauthorized financial accounts, and both financial and medical identity theft, among other criminal activity. Theft of PHI necessarily implies harm because the misuse of data is the only plausible explanation for the Data Breach.

44.     In a recent survey[13] conducted by the Medical Identity Fraud Alliance (MIFA), a healthcare industry trade group, 52% of victims said their information was used to obtain government benefits like Medicare or Medicaid. And 59% had their identity used to obtain healthcare, while 56% said a scammer parlayed their data into prescription drugs or medical equipment.

45.     This type of injury and harm, including actual fraud, is directly traceable to the Data Breach. This harm is not just possible, not just certainly impending, but has happened and is *ongoing*, and all Class Members are in imminent and immediate danger of being further subjected to this injury.

46.     The ramifications of South City Hospital's failure to keep its victims' PHI secure are long lasting and severe. Once PHI is stolen, fraudulent use of that information and damage to victims may continue for years.

47.     The fraudulent activity resulting from the Data Breach may not come to light for years.

---

[13] *Fifth Annual Study on Medical Identity Theft*, MED. IDENTITY FRAUD ALLIANCE, (Feb. 2015), *available at* http://www.medidfraud.org/wp-content/uploads/2015/02/2014_Medical_ID _Theft_Study1.pdf (last visited March 26, 2020).

4891-7638-8640, v. 2

48.     Despite all of the publicly available knowledge of PHI being compromised and alerts regarding the phishing email scam perpetrated, South City Hospital's approach to maintaining the privacy of its victims' PHI was lackadaisical, cavalier, reckless, or in the very least, negligent.

49.     South City Hospital has failed to compensate Plaintiff and Class Members victimized in this Data Breach. Upon information and belief, South City Hospital has not offered to provide assistance or compensation for the costs and burdens — current and future — associated with the identity theft and fraud resulting from the Data Breach. South City Hospital has not offered victims of the Data Breach any assistance in dealing with the IRS, the state tax agencies, or any of the three major credit-reporting agencies.

50.     Even if South City Hospital were to offer said minimal assistance, it is incorrect to assume that reimbursing a victim of the Data Breach for financial loss due to fraud makes that individual whole again. On the contrary, after conducting a study, the U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[14]

51.     As a result of South City Hospital's failure to adequately protect and secure the Plaintiff's and the Class members' PHI and prevent the Data Breach, Plaintiff and Class Members have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at increased risk of suffering:

     a.     Fraudulent charges to financial accounts;

---

[14] Victims of Identity Theft, 2012 (Dec. 2013) at *10, 11, available at* https://www.bis.gov/content/pub/pdf/vitl2.pdf (last visited April 11, 2018).

- 11 -

4891-7638-8640, v. 2

b.      Loss of privacy;

c.      The loss of the opportunity to control how their PHI is used;

d.      The diminution in value of their PHI;

e.      The compromise, publication and/or theft of their PHI;

f.      Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

g.      Lost opportunity costs and lost wages associated with the time and effort expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Disclosure, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

h.      Unauthorized use of stolen PHI;

i.      The continued risk to their PHI, which remains in the possession of South City Hospital and is subject to further breaches so long as South City Hospital fails to undertake appropriate measures to protect the PHI in its possession; and

j.      Current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiff and Class Members.

52.      Stolen PHI is a one of the most valuable commodities on the criminal information black market. In 2014, the FBI warned healthcare organizations that PHI data is worth 10 times as much as personal credit card data on the black market.[15] PHI data for sale is so valuable because

---

[15] Stolen PHI health credentials can sell for up to 20 times the value of a U.S. credit card number, according to Don Jackson, director of threat intelligence at PhishLabs, a cyber-crime protection company who obtained his data by monitoring underground exchanges where cyber-criminals sell the information. *See* Humer, Caroline & Finkle, Jim, *Your medical record is worth more to hackers than your credit card*, REUTERS, (Sep. 24, 2014), https://www.reuters.com/article/us-

- 12 -

PHI is so broad, and it can therefore be used for a wide variety of criminal activity such as: to create fake IDs, buy medical equipment and drugs that can be resold on the street, or combine patient numbers with false provider numbers to file fake claims with insurers.

53.    The value of Plaintiff's and the Class Members' PHI on the black market is considerable. Stolen PHI trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" Internet websites, making the information publicly available, for a substantial fee of course.

54.    It can take victims years to spot identity or PHI theft, giving criminals plenty of time to milk that information for cash. That is precisely what makes PHI more desirable to criminals than credit card theft. Credit card theft can be spotted by banks early on, and accounts can be quickly frozen or cancelled once the fraud is detected, making credit card data much less valuable to criminals than PHI.

55.    South City Hospital permitted the disclosure of the PHI of Plaintiff and the Class Members for criminals to use in the conduct of criminal activity. Specifically, South City Hospital failed to implement adequate security measures resulting in the disclosure and exposure of the PHI of Plaintiff and the Class Members to persons engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (*i.e.*, identity fraud), all using the stolen PHI.

---

cybersecurity-hospitals/your-medical-record-is-worth-more-to-hackers-than-your-credit-card-idUSKCN0HJ21I20140924 (last visited March 26, 2020). Dark web monitoring is a commercially available service which, at a minimum, Defendant can and should perform (or hire a third-party expert to perform).

- 13 -

56.     South City Hospital's use of outdated and unsecured computer systems and software that are easy to hack, and its failure to maintain adequate security measures and an up-to-date technology security strategy, demonstrates a willful and conscious disregard for healthcare patient privacy, and has exposed the PHI of Plaintiff and thousands of Class Members to unscrupulous operators, con artists, and outright criminals.

## PLAINTIFF'S EXPERIENCE

57.     Plaintiff Stark is a citizen of St. Louis, Missouri, and he was formerly a patient of South City Hospital in August 2019, approximately, at the time Defendant was St. Alexius Hospital.

58.     As a condition for receiving treatment from South City Hospital, Plaintiff and the Class members were required to make available to South City Hospital, its agents, and its employees, sensitive and confidential PHI, including, but not limited to, names, Social Security numbers, health insurance information, radiology imaging, and/or other related medical information.

59.     That South City Hospital acquires, collects, and stores a massive amount of PHI from its patients in its computer network systems.

60.     By obtaining, collecting, using, and deriving a benefit from Plaintiff's and the Class members' PHI, South City Hospital assumed legal and equitable duties to those individuals and knew or should have known that it was responsible for protecting their PHI from unauthorized disclosure.

61.     Plaintiff has taken reasonable steps to maintain the confidentiality of his PHI.

62.     Plaintiff relied on South City Hospital to keep his PHI confidential and securely maintained, to use this information for business purposes only.

4891-7638-8640, v. 2

63.    That, upon information and belief, South City Hospital maintains a policy, and gives a copy to its patients, which specifically acknowledges its legal obligation to maintain the privacy of patient PHI entrusted to it and to control the disclosure thereof, and which enumerates those instances in which Defendant may disclose PHI, and in which South City Hospital states that it must notify patients in the event their PHI is compromised.

64.    South City Hospital failed to honor the terms of the privacy policy when it permitted the Plaintiff's PHI to be accessed by third parties not listed in the Privacy Policy.

65.    South City Hospital also failed to honor the terms of the privacy policy by failing to adequately safeguard that PHI.

66.    In short, the Data Breach was not permitted by South City Hospital's Privacy Policy.

67.    Plaintiff entrusted his PHI to South City Hospital solely for the purpose of effectuating treatment from St. Alexius hospital with the expectation and implied mutual understanding that South City Hospital would strictly maintain the confidentiality of the PHI and safeguard it from theft or misuse.

68.    Plaintiff would not have entrusted South City Hospital with his PHI had he known South City Hospital would fail to take adequate steps to secure its computer and email systems.

69.    That on or about January 14, 2022, Plaintiff received a letter from South City Hospital (the "Notice") notifying him of the Data Breach, and that his PHI had been compromised as a result, including his name, Social Security number, health insurance information, radiology imaging, and/or other related medical information.

70.    That as a result of the Data Breach, Plaintiff Stark suffered fraudulent and unauthorized charges to his financial accounts with US Bank and/or MetaBank.

- 15 -

71.    That, as a result, Plaintiff was required to expend time and effort to change the information associated with automatic billing on said financial account.

72.    That, further, as a result of the Data Breach, Plaintiff was required to expend considerable time and effort monitoring his accounts to protect himself from additional identity theft.

73.    That, even further, as a result of the Data Breach, Stark has suffered the loss of the opportunity to control how his PHI is used; the diminution in value of his PHI; the compromise, publication and/or theft of his PHI; out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud; lost opportunity costs and lost wages associated with the time and effort expended and the loss of productivity from addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud; unauthorized use of stolen PHI; the continued risk to his PHI, which remains in the possession of South City Hospital and is subject to further breaches so long as South City Hospital fails to undertake appropriate measures to protect the PHI in its possession; and current and future costs in terms of time, effort and money that will be expended to prevent, detect, contest, remediate and repair the impact of the Data Breach for the remainder of the lives of Plaintiff.

74.    Aside from the financial loss consequences, both direct and indirect, that Plaintiff is more than likely to face, identity theft negatively impacts credit scores.[16]

---

[16] Direct financial loss refers to the amount of money stolen or misused by the identity theft offender. Indirect financial loss includes any outside costs associated with identity theft, like legal fees or overdraft charges. A 2014 Department of Justice study found that victims experienced a combined average loss of $1,343.00. In total, identity theft victims lost a whopping $15.4 billion in 2014 alone. *See* Gredler, Cody, *The Real Cost of Identity Theft*, CSIDENTITY, (Sep. 9, 2016), https://www.csid.com/2016/09/real-cost-identity-theft/ (last visited March 26, 2020).

75.     It can take years to spot identity or PHI theft. Even if South City Hospital offered Plaintiff a lifetime subscription to a credit monitoring service, which it did not, Plaintiff would be powerless to prevent identity theft.

76.     Identity theft is not only impacting Plaintiff and Class Members financially, but it is taking a significant emotional and physical toll. Plaintiff and other Class Members, like other PHI theft victims, fear for his/their personal financial security and are experiencing feelings of rage and anger, anxiety, sleep disruption, stress, fear, and/or pain and suffering.

77.     This goes far beyond allegations of mere worry or inconvenience; the injury and harm to a Data Breach victim is the type contemplated and addressed by law.

## CLASS ALLEGATIONS

78.     Pursuant to Missouri Court Rule of Civil Procedure 52.08, Plaintiff brings this class action on behalf of herself and the following proposed Class (the "Class"):

> All citizens of Missouri whose PHI was compromised as a result of the Data Breach with South City Hospital which was announced by South City Hospital on or about January 14, 2022.

79.     The following people are excluded from the Class: (1) any judge or magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, affiliated entities, and any entity in which the Defendant or its parent has a controlling interest, and their current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

80.     Plaintiff and the Class Members satisfy the numerosity, commonality, typicality,

- 17 -

adequacy, and predominance prerequisites for suing as representative parties pursuant to Rule 52.08(a).

81.    **Numerosity**: The exact number of Class members is unknown but is estimated to be at least 21,601[17] persons at this time, and individual joinder in this case is impracticable. Class Members can be easily identified through Defendant's records and objective criteria permitting self-identification in response to notice, and notice can be provided through techniques similar to those customarily used in other data breach, consumer breach of contract, unlawful trade practices, and class action controversies.

82.    **Typicality**: Plaintiff's claims are typical of the claims of other Class members in that Plaintiff, and the Class Members sustained damages arising out of Defendant's Data Breach caused by its negligence and/or other wrongful conduct and misrepresentations, false statements, concealment, and unlawful practices, and Plaintiff and the Class Members sustained similar injuries and damages, as a result of Defendant's uniform tortious and illegal conduct.

83.    **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Class. Plaintiff has no interests that conflict with, or are antagonistic to those of, the Class, and Defendant has no defenses unique to Plaintiff.

84.    **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

---

[17] *See* U.S. Department of Health and Human Services, Office for Civil Rights, Breach Portal: Notice to the Secretary of HHS Breach of Unsecured Protected Health Information, available at https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf

a.      whether Defendant failed to use reasonable care and commercially reasonable methods to safeguard and protect Plaintiff's and the other Class Members' PHI contained in its computer systems from unauthorized release and disclosure, and was negligent;

b.      whether South City Hospital breached its contractual promises to safeguard Plaintiff's and the Class Members' PHI;

c.      whether South City Hospital knew or should have known about the inadequacies of its data security policies and system and the dangers associated with storing sensitive PHI;

d.      whether the proper data security measures, policies, procedures, and protocols were in place and operational within Defendant's computer and software systems to safeguard and protect Plaintiff's and the other Class Members' PHI from unauthorized release and disclosure;

e.      whether Defendant took reasonable measures to determine the extent of the Data Breach after it was discovered;

f.      whether Defendant's delay in informing Plaintiff and the other Class Members of the Data Breach was unreasonable;

g.      whether Defendant's method of informing Plaintiff and the other Class Members of the Data Breach was unreasonable;

h.      whether Plaintiff and the Class Members suffered injury and damages as a proximate cause or result of Defendant's negligent conduct and/or breach of its contract with Plaintiff and the Class Members;

i.      whether Defendant's practices and representations related to the Data

- 19 -

Breach that compromised the PHI breached implied warranties;

      j.     what the proper measure of damages is; and

      k.     whether Plaintiff and the Class Members are entitled to restitutionary, injunctive, declaratory, or other relief.

85.    **Superiority**: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable. The damages suffered by the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendant's misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort and expense will be fostered, and uniformity of decisions ensured.

86.    A class action is therefore superior to individual litigation because:

      a.     the amount of damages available to an individual plaintiff is insufficient to make litigation addressing Defendant's conduct economically feasible in the absence of the class action procedural device;

      b.     individualized litigation would present a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system;

- 20 -

and

      c.     the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

      87.     In addition to satisfying the prerequisites of Rule 52.08(a), Plaintiff satisfies the requirements for maintaining a class action under Rule 52.08(b) because:

      a.     the prosecution of separate actions by the individual Class Members would create a risk of inconsistent or varying adjudication which would establish incompatible standards of conduct for Defendant;

      b.     the prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests;

      c.     Defendant has acted or refused to act on grounds that apply generally to the proposed Class, thereby making final injunctive relief or declaratory relief herein appropriate with respect to the proposed Class as a whole; and

      d.     questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**COUNT I**
**BREACH OF CONTRACT**
**On Behalf of Plaintiff and the Class**

      88.     That the factual and legal allegations set forth in the preceding paragraphs are reiterated and incorporated as if fully restated herein.

- 21 -

89.    That Defendant offered to provide medical treatment services to Plaintiff Stark and the Class Members in exchange for payment.

90.    Plaintiff and Class Members accepted Defendant's offer to provide medical treatment by paying for and receiving said treatment.

91.    Defendant required Plaintiff and Class Members to provide their PHI including patients' names, Social Security numbers, health insurance information, radiology imaging, and/or other related medical information, in order to receive care from Defendant.

92.    Plaintiff and Class Members exchanged valuable consideration – money – with Defendant for services, a crucial part of which was Defendant's implicit promise to protect their PHI from unauthorized disclosure.

93.    That, upon information and belief, Defendant expressly promised Plaintiff and the Class Members that Defendant would only disclose PHI under certain circumstances, none of which relate to the Data Breach.

94.    Necessarily implicit in the agreement between Defendant and its patients, including Plaintiff and Class members, was Defendant's obligation to use such PHI for business and treatment purposes only, to take reasonable steps to secure and safeguard that PHI, and not make disclosures of the PHI to unauthorized third parties.

95.    Further implicit in the agreement, Defendant was obligated to provide Plaintiff and the Class Members with prompt and adequate notice of any and all unauthorized access and/or theft of their PHI.

96.    Plaintiff and the Class Members would not have entrusted their PHI to Defendant in the absence of such agreement with Defendant.

97.    Defendant materially breached the implied contract(s) it had entered with Plaintiff

and Class Members by failing to safeguard such information and failing to notify them promptly

of the intrusion into its computer systems that compromised such information. Defendant further

breached the implied contracts with Plaintiff and Class members by:

        a.      Failing to implement adequate security measures to properly safeguard and

protect Plaintiff's and Class Members' PHI stored on South City Hospital's computer systems;

        b.      Failing to comply with industry standards as well as legal obligations that

are necessarily incorporated into the parties' agreement;

        c.      Failing to ensure the confidentiality and integrity of electronic PHI that

Defendant created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1).

98.      That Defendant's material breaches of its agreements was the direct cause and a

proximate cause in bringing about injury and damages sustained by Plaintiff and Class Members

as described above.

99.      Plaintiff and Class Members have performed as required under the relevant

agreements, or such performance was waived by the conduct of Defendant.

100.     Under the laws of Missouri, good faith is an element of every contract. All such

contracts impose upon each party a duty of good faith and fair dealing. The parties must act with

honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection

with executing contracts and discharging performance and other duties according to their terms,

means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a

contract are mutually obligated to comply with the substance of their contract in addition to its

form.

101.     Subterfuge and evasion violate the obligation of good faith in performance even

when an actor believes their conduct to be justified. Bad faith may be overt or may consist of

4891-7638-8640, v. 2

inaction, and fair dealing may require more than honesty.

102.    Defendant failed to promptly advise Plaintiff and Class Members of the Data Breach.

103.    In these and other ways, Defendant violated its duty of good faith and fair dealing.

104.    Plaintiff and Class Members have sustained damages as a result of Defendant's breaches of its agreement, including breaches thereof through violations of the covenant of good faith and fair dealing.

## COUNT II
## UNJUST ENRICHMENT
### (on Behalf of Plaintiff and the Class against Defendant)

105.    That the factual and legal allegations set forth in the preceding paragraphs are reiterated and incorporated as if fully restated herein.

106.    This claim is pleaded in the alternative to the breach of contract claim.

107.    Plaintiff and Class Members conferred a monetary benefit upon Defendant in the form of monies paid for healthcare services at its locations.

108.    Defendant appreciated or had knowledge of the benefits conferred upon itself by Plaintiff and Class Members. Defendant also benefited from the receipt of Plaintiff's and Class Members' PHI, as this was used to facilitate payment and to make insurance claims.

109.    As a result of Defendant's conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between their purchases made with reasonable data privacy and security practices and procedures that Plaintiff and Class Members paid for, and those purchases without unreasonable data privacy and security practices and procedures that they received.

110.    Under principals of equity and good conscience, Defendant should not be permitted

- 24 -

to retain the money belonging to Plaintiff and Class Members because Defendant failed to implement (or adequately implement) the data privacy and security practices and procedures for itself that Plaintiff and Class Members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

111.    Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds received by it as a result of the conduct and Data Breach alleged herein.

**COUNT III**
**NEGLIGENCE**
**(on Behalf of Plaintiff and the Class)**

112.    That the factual and legal allegations set forth in the preceding paragraphs are reiterated and incorporated as if fully restated herein.

113.    That South City Hospital had the duty to Plaintiff and the proposed Class members to exercise ordinary and reasonable care to protect their sensitive, non-public PHI from being accessed by unauthorized parties.

114.    That the foregoing duty arises from the special relationship between the Plaintiff and the Class members and the Defendant, South City Hospital.

115.    That by conduct complained of in the foregoing paragraphs, its failure to undertake adequate security measures to protect Plaintiff's and the Class members' PHI, Defendant did breach the duties owed to Plaintiff and the Class members, and was negligent.

116.    That Defendant knew or should have known that if it failed to undertake adequate security measures to protect Plaintiff's and the Class members' PHI, said PHI was likely to be accessed by unauthorized persons, resulting in injury and damages to Plaintiff and the Class members.

- 25 -

117.    That Defendant's negligence was the direct cause and a proximate cause in bringing about injury and damages sustained by Plaintiff and Class Members as described above.

## COUNT IV
### Negligence *Per Se*
### (On Behalf of Plaintiff and the Class)

118.    Plaintiff and the Class Members incorporate the above allegations as if fully set forth herein.

119.    Pursuant to the FTC Act, 15 U.S.C. § 45, Defendant had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

120.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect consumers' PII. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff's and Class Members' sensitive PII.

121.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect consumers' PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of consumer PII it collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to its patients in the event of a breach, which ultimately came to pass.

122.    The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive

- 26 -

practices, caused the same harm to its consumers as that suffered by Plaintiff and the Class Members.

123.    Defendant had a duty to Plaintiff and Class Members to implement and maintain reasonable security procedures and practices to safeguard Plaintiff's and Class Members' PII.

124.    Defendant breached its respective duties to Plaintiff and the Class Members under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and Class Members' PII.

125.    Defendant's violation of Section 5 of the FTC Act and its failure to comply with applicable laws and regulations constitutes negligence *per se*.

126.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class Members, they would not have been injured.

127.    The injury and harm suffered by Plaintiff and Class members was the reasonably foreseeable result of Defendant's breach of its duties. Defendant knew or should have known that it was failing to meet its duties and that its breach would cause Plaintiff and Class Members to suffer the foreseeable harms associated with the exposure of their PII.

128.    Had Plaintiff and the Class members known that Defendant did not adequately protect patient PII, they would not have entrusted Defendant with their PII in the first place.

129.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and Class Members have suffered harm, including loss of time and money resolving fraudulent charges; loss of time and money obtaining protections against future identity theft; lost control over the value of PII; unreimbursed losses relating to fraudulent charges; losses relating to exceeding credit and debit card limits and balances; harm resulting from damaged credit scores

and information; and other harm resulting from the unauthorized use or threat of unauthorized use of stolen personal information, entitling them to damages in an amount to be proven at trial.

### COUNT V
### Invasion of Privacy
### (On Behalf of Plaintiff and the Class)

130.    Plaintiff and the Class Members incorporate the above allegations as if fully set forth herein.

131.    Defendant publicized private details and facts not generally known to the public, not publicly available, and not of legitimate public concern about Plaintiff and Class Members by disclosing and exposing Plaintiff's and Class Members' PHI to enough people that it is reasonably likely those facts will become known to the public at large, including without limitation on the dark web and elsewhere.

132.    The disclosure of the PHI, including patients' names, Social Security numbers, health insurance information, radiology imaging, and/or other related medical information is particularly harmful and would be offensive to a reasonable person of ordinary sensibilities.

133.    Defendant has a special relationship with Plaintiff and the Class Members and Defendant's disclosure of PHI is certain to embarrass them and offend their dignity. Defendant should appreciate that the cyber-criminals who stole the PHI would further sell and disclose the PHI as they are doing. That the original disclosure is devastating to the Plaintiff and the Class Members, even though it originally may have only been disclosed to one person or a limited number of cyber-criminals, does not render it any less a disclosure to the public-at-large.

134.    Plaintiff's and the Class Members' PHI was publicly disclosed by Defendant in the Data Breach with reckless disregard for the reasonable offensiveness of the disclosure. Such disclosure is highly offensive and would be to any person of ordinary sensibilities. Defendant knew

- 28 -

that Plaintiff's and Class Members' PHI is not a matter of legitimate public concern. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been injured and are entitled to damages.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, MONOLITO STARK, individually and on behalf of the proposed Class, requests that the Court:

A.     Certify this case as a Class action on behalf of the Class defined above, appoint Plaintiff Monolito Stark as Class representative, and appoint the undersigned as Class counsel;

B.     Award declaratory and other equitable relief as is necessary to protect the interests of Plaintiff and the Class Members;

C.     Award injunctive relief as is necessary to protect the interests of Plaintiff and the Class Members;

D.     Enter an Order enjoining Defendant from further deceptive and unfair practices and making untrue statements with respect to the Data Breach and the stolen PHI;

E.     Enter an award in favor of Plaintiff and the Class Members that includes compensatory, exemplary, punitive damages, and statutory damages, including pre- and post-judgment interest thereon, in an amount to be proven at trial;

F.     Award restitution and damages to Plaintiff and the Class Members in an amount to be determined at trial;

G.     Enter an award of attorneys' fees and costs, as allowed by law;

H.     Enter an award of pre-judgment and post-judgment interest, as provided by law;

I.     Grant Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

- 29 -

J.      Grant such other or further relief as may be appropriate under the circumstances.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:      August __23__, 2022

Respectfully submitted,

Joshua D. Margolis #56041
MUCHNICK HABER MARGOLIS, LC
8151 Clayton Rd., Ste. 201 Clayton, MO 63117
Tel: (314) 725-5050
Fax: (314) 726-2042
josh@mhmlegal.com

Lynn A. Toops
Lisa M. La Fornara
COHEN & MALAD, LLP
One Indiana Square Suite 1400
Indianapolis, IN 46204
Tel: (317) 636-6481
ltoops@cohenandmalad.com
llafornara@cohenandmalad.com

J. Gerard Stranch, IV*
Peter J. Jannace*
BRANSTETTER, STRANCH & JENNINGS, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gerards@bsjfirm.com
peterj@bsjfirm.com

*Motion for admission to be filed

*Counsel for Plaintiff and the Proposed Class*

- 30 -

## <u>Certificate of Filing</u>

The undersigned hereby certifies that the foregoing Class Action Petition has been filed by using the Court's Electronic Case Filing system on this  23RD  day of August, 2022.

4891-7638-8640, v. 2